UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
:
UNITED STATES SECURITIES AND           :
EXCHANGE COMMISSION,                   :
                                       :
        **Plaintiff,**            :
                                       :    Civil Action No. _____
        v.                        :
                                       :    **JURY TRIAL DEMANDED**
LEE A. BRESSLER,                       :
                                       :
        **Defendant.**            :
                                       :
---------------------------------------------------------------x

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") files this Complaint against Defendant Lee A. Bressler ("Bressler"), and respectfully shows the Court:

## SUMMARY

1. From approximately September 2017 through February 2018, Bressler, Portfolio Manager of an Oklahoma-based hedge fund called Carbon Master Fund, L.P. (the "Fund"), placed unauthorized high-risk margin and option trades on behalf of the Fund and engaged in other fraudulent conduct that caused the Fund to suffer a complete loss of all investor capital (more than $10 million). Bressler placed these trades and engaged in this conduct without disclosure to the Fund's outside investors.

2. In late 2016, Bressler and two other individuals (collectively, the "Carbon Principals") founded the Fund and Carbon Investments Partners, LLC ("Carbon"), the general partner of, and investment adviser to, the Fund. Aside from the Carbon Principals, each of

whom, directly or indirectly, invested varying amounts in the Fund, 10 outside investors invested in the Fund (collectively, "Fund Investors").

3. The Carbon Principals intended the Fund to be, and marketed it to Fund Investors as, a conservative, market-neutral hedge fund focused on equities in the industrial sector, with an emphasis on capital preservation. The Fund's core strategy was to limit risk through limitations on position size and concentration in any one security and actively monitoring net volatility exposure. The Carbon Principals initially opened one trading account (the "Primary Account") through its prime broker.

4. Bressler was the Fund's Portfolio Manager, and he had primary discretionary authority over the Fund's trading. In late summer and early fall 2017, without disclosure to Fund Investors, Bressler opened two additional Fund trading accounts ("Side Accounts"). The Fund's Primary Account and Side Accounts were margined against the positions held in the Fund's Primary Account, a fact Bressler also did not disclose to Fund Investors.

5. Beginning at least as early as September 2017, and continuing through February 2018, Bressler placed unauthorized high-risk trades that he allocated to the Side Accounts. These trades were contrary to the Fund's conservative investment strategy as marketed to Fund Investors and were not disclosed to Fund Investors. While making these unauthorized trades and materially misleading statements, Bressler continued to solicit investors to invest in the Fund. In February 2018, Bressler's fraudulent conduct resulted in the Fund's collapse and a complete loss of all invested capital, including all of the invested capital by Fund Investors.

6. Through his fraudulent conduct, Bressler violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Sections 206(1), 206(2), and 206(4) of the

Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8 thereunder. The Commission seeks a permanent injunction, a civil penalty, and an order barring Bressler from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

7. The Commission brings this action against Bressler pursuant to authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)]; and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

8. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)]; and, Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9 (e), and 80b-14].

9. In connection with the conduct described in this Complaint, Bressler, directly or indirectly, made use of the mails or means or instruments of transportation or communication, or of the facilities of a national securities exchange, in interstate commerce.

10. Venue is proper in this District, because Bressler resides and transacted business in this District, and certain of the acts, practices, transactions, and courses of business constituting violations of the securities laws alleged in this Complaint occurred within this District. In particular, Bressler's illicit trading on behalf of the Fund and his misrepresentations to investors occurred in this District.

## DEFENDANT

11. Lee A. Bressler is a resident of New York, New York. From at least November 2016 through February 2018, Bressler was Portfolio Manager of the Fund, beneficiary of the

Bressler Trust (an investor in the Fund), and Chief Investment Officer, member, and one-third owner of Carbon. He was also an investment adviser as defined in Section 202(a)(11) of the Advisers Act. On January 18, 2022, in lieu of testifying before officers of the Commission, Bressler invoked his Fifth-Amendment privilege against self-incrimination.

## RELEVANT ENTITIES

12. Carbon was a Delaware corporation formed in 2016 with its principal place of business in Oklahoma City, Oklahoma. Carbon was the sole general partner to the Fund. Carbon was not registered as an investment adviser with the Commission. It was also not registered with the State of Oklahoma pursuant to exemption under Section 660:11-7-17 of Title 660 of the Oklahoma Administrative Code. Carbon is now operationally defunct.

13. The Fund was a Delaware limited partnership and an Oklahoma-based hedge fund formed in 2016. The Fund is now operationally and financially defunct.

## FACTS

**The Fund's Conservative Investment Strategy**

14. In late 2016, the Carbon Principals founded Carbon and the Fund, with Carbon serving as the general partner and investment adviser to the Fund. The Fund was engaged primarily in the business of investing, reinvesting, and/or trading in securities. As disclosed to Fund Investors, the Carbon Principals intended the Fund to be a conservative, market-neutral hedge fund. The Fund's trading was intended to occur through the Primary Account at its prime broker.

15. The core aspects of the Fund's investment strategy included that it would: (i) focus primarily on equities in the industrial sector; (ii) emphasize capital preservation by trying to maintain a net exposure of close to 0% and a targeted volatility of 8-10% annually; and (iii)

limit the position size of any one security to approximately 10% of invested capital.  The Carbon Principals consistently marketed the Fund as having this conservative investment strategy through verbal and written communications including, but not limited to, investor presentations, monthly tear sheets and summaries on the Fund's performance, and the Fund's private placement memorandum ("PPM").

16. At the time of the Fund's collapse, investments by the Carbon Principals, including an investment by the Bressler Trust, accounted for approximately 85% of the lost capital.  Fund Investors represented roughly $1.58 million of the Fund's total $10 million in assets under management.

17. Bressler was the Fund's Portfolio Manager and had primary authority over the Fund's trading activities.  Bressler placed almost every trade on the Fund's behalf and was responsible for communicating with the Fund's prime broker.  Bressler received a salary in his role as Portfolio Manager, and Carbon's marketing materials represented that Bressler was primarily responsible for making investment decisions for the Fund.

**Bressler Understood the Fund's Investment Strategy**

18. As Portfolio Manager of the Fund and one of three founding members of Carbon, Bressler was fully aware of every aspect of the Fund's conservative investment strategy and mandates.  He was involved in the drafting, review, and approval of the Fund's marketing materials and PPM.

19. Further, from November 2016 through the Fund's collapse in February 2018, Bressler drafted and distributed monthly tear sheets to actual and prospective investors that represented core aspects of the Fund's strategy, including the following representation:

> [The Fund] is **a market neutral hedge fund** launched in November 2016 . . .[The Fund] **focuses on equities in the industrials sector**, utilizing a sector coverage

model for in-depth company analysis . . . It **emphasizes capital preservation** and has minimal correlation to broader indices or asset classes. Carbon Investment Partners **will maintain a net exposure of close to 0%** with disciplined use of financial leverage to enhance its gross exposure. (emphasis added)

20. From at least September 2017 through January 2018, Bressler also distributed presentation materials to actual and prospective investors containing these same representations regarding the Fund's investment strategy, plus an additional representation that no single Fund investment would exceed 10 percent of the Fund's assets under management. Further, in February 2019, Bressler admitted under oath in a deposition related to an arbitration proceeding that he understood that the Fund's investment strategy was marketed and represented to investors as market neutral (meaning a net exposure near 0%) with an emphasis on the industrial sector and capital preservation, and a volatility level between 8 and 10% annually.

**In Spring 2017, Bressler Traded Outside the Fund's Investment Strategy**

21. In April and May 2017, Bressler placed trades on behalf of the Fund in two securities which were outside the Fund's stated parameters that resulted in Fund losses of approximately $450,000. The first trade was outside the Fund's conservative investment strategy and exceeded the Fund's mandate on position size. In the second trade, Bressler purchased options that created a multi-million dollar notional exposure, far in excess of the Fund's targeted net exposure of zero percent.

22. After learning of these trades (and the resulting losses to the Fund), the other Carbon Principals discussed terminating Bressler. Bressler, however, offered to invest more than $1 million to cover the losses and to show his commitment to the Fund. The Bressler Trust, of which Bressler is a beneficiary, then invested an additional $1.4 million in the Fund. Further, Bressler and the other Carbon Principals agreed that the Fund would not trade in options for the foreseeable future. Despite Bressler's trading failures, the other Carbon Principals allowed him

6

to remain as Fund Portfolio Manager and Carbon's Chief Investment Officer.

23. Subsequently, the Carbon Principals -- in conjunction with the Fund's third-party administrator and its outside counsel -- determined that the tax-efficient way to insulate Fund Investors from the losses caused by Bressler's unauthorized trades was to place the securities at issue in a "side pocket" accounting structure in which only the Carbon Principals would participate. The side pocket structure was intended to separate the spring 2017 trading losses from the other investments held by the Fund.

24. By letter dated July 24, 2017, the Carbon Principals notified the Fund Investors of the spring 2017 trades. This letter admitted to Fund Investors that "one or more investments" were made "outside of the typical risk parameters of the Fund" and "may not be appropriate for the general Fund portfolio." Carbon told Fund Investors that it, as the General Partner, would "bear the cost" of these investments by transferring them into "one or more newly created side pockets . . . to be held only in the name of the General Partner and/or the current members of the General Partner." Carbon offered Fund Investors the opportunity to participate in the side pocket structure, but recommended that they _not_ do so, as Carbon did not believe these investments would "collectively generate net income." For Fund Investors who did not elect to participate, Carbon represented that the Primary Account would "no longer hold their pro-rata share" of these investments and that their capital account statements would remain in the same position "it would have been in had the [improper investments] not been made." None of the Fund Investors elected to participate in the side pocket structure. No disclosure was made to the Fund Investors that the side pocket structure would include additional trading activity.

25.     Despite his improper trading in the spring of 2017, Bressler continued to have primary discretionary authority over trading in the Fund and continued to be the primary contact on behalf of the Fund with its third-party administrator and prime broker.

**Without Telling Fund Investors, Bressler Opened the Side Accounts at the Fund's Prime Broker**

26.     Following the creation of the "side pocket" structure to cabin the spring 2017 losses, Bressler opened at least two additional trading accounts with the Fund's prime broker. Bressler made representations to the Fund's prime broker that "both side pocket accounts were opened for trading" and further trade allocations to be associated with the "same legal entity," but "may not always be pari passu with the main fund account." At that time, the Fund held assets worth approximately $3.5 million. Bressler opened these Side Accounts on behalf of the Fund without any disclosure to Fund Investors. In particular, Bressler did not disclose to Fund Investors that the trading activity allocated to these Side Accounts would be margined against holdings in the Primary Account. In his role as Fund Portfolio Manager, Bressler placed high-risk trades from at least September 2017 through February 2018 that were outside the Fund's disclosed investment parameters, allocating many of these trade positions to the Side Accounts.

27.     The Fund's third-party administrator notified Bressler that it would terminate its agreement with the Fund unless, among other things, the Fund's offering documents were updated to permit trading in the Side Accounts. In response, on September 13, 2017, Bressler sent the Fund administrator a redlined version of the Fund's PPM. This version deleted the Fund's conservative mandate and replaced it with language claiming "opportunistic investments that may be more volatile and risky" have been made or may in the future be made as "Side Pocket Investments." Importantly, while Bressler sent this redlined version of the PPM to the Fund administrator, neither Bressler nor Carbon ever sent a revised or updated PPM to any Fund Investors who had invested before September 2017, and they did not disclose to such Fund Investors any of the Fund's trading activities regarding the Side Accounts. In addition, Bressler

continued to disseminate original, unrevised Fund marketing materials and to tout the Fund's conservative investment strategy and mandate to actual and prospective investors, even though he knew the Fund was trading well outside that mandate.

28. Uncomfortable with the high-risk trades that Bressler allocated to the Side Accounts, the Fund administrator terminated its relationship with the Fund on October 19, 2017. The Fund administrator noted in an internal memo its "suspicion" that the "business of the Fund does not seem to be conducted in accordance with the Fund's governing documents" and that "the side pockets may be intended to manipulate the performance reported to the other limited partners."

**Bressler's Fund Trading, Including in Positions Allocated to the Side Accounts, Wiped Out the Fund's Capital**

29. From at least September 2017 through February 2018, Bressler placed increasingly risky trades, including options trades that he allocated to the Side Accounts. These trading positions were outside the Fund's investment mandate and none were disclosed to Fund Investors.

30. On January 24, 2018, Bressler emailed a lender regarding a personal $1 million loan obligation that was outstanding. He stated to the lender that he was planning to repay the loan in the next week or two, noting that "things have been going well at work and I am going to be receiving a substantial distribution. I think it makes sense to use that to pay off the debt balance." Also, on January 31, 2018, only one week before the Fund's implosion, Bressler tried unsuccessfully to liquidate some of the Bressler Trust holdings. Bressler emailed the Fund's temporary new administrator:[1] "[I] have to redeem $200,000 of my own investment in the fund-lots of private school tuition to pay this month! So it is a separate transaction. I know normally

---

[1] At the time of the Fund's collapse, Carbon was still in the process of onboarding a new fund administrator.

we have a notice period, but since I am a member of the [General Partner] I can waive that for myself (I assume)."

31. Regardless of his motives, Bressler's unauthorized trading did not pay off. Rather, his trading resulted in a complete loss of all Fund investments. Some of Bressler's illicit trades included:

- January 26, 2018: trade in a non-industrial stock with a trade value of $22.77 million, representing 175% of total Fund value, and resulting in losses of $1.46 million.

- January 29, 2018: trade in a non-industrial stock with a trade value of $7.66 million, representing 141% of total Fund value, and resulting in losses of around $726,000.

- January 31, 2018: trade in a non-industrial stock with a trade value of $59.54 million, representing 716% of total Fund value, and resulting in losses of around $1.28 million.

- February 7, 2018: trade options in a non-industrial stock with a trade value of $6.56 million, representing 446% of total Fund value, and resulting in losses of around $5.8 million.

- February 7, 2018: trade in a non-industrial stock with a trade value of $47.38 million, representing 3,446% of total Fund value, and resulting in losses of around $6.5 million.

**Bressler Continued to Secure and Solicit Investors On Behalf of Carbon During Late 2017 and Early 2018**

32. From September 2017 through February 2018, Bressler solicited and secured three additional investors in the Fund, touting the Fund's conservative investment mandate while he was contemporaneously and intentionally breaching this mandate through trades he allocated to the Side Accounts. In soliciting these three investors, Bressler sent each investor the monthly tear sheets that he drafted. These materials recited the core aspects of the Fund's conservative strategy. Neither Bressler nor the tear sheets that he drafted and distributed disclosed the unauthorized trading outside the mandate of the Fund. In addition, Bressler spoke with at least two of the investors before they invested and re-emphasized the key aspects of the Fund's

10

conservative investment strategy. Notably, he did not disclose in those communications the contemporaneous trades he had made on behalf of the Fund that were outside of the Fund's mandate. Bressler also distributed presentation materials about the Fund to at least one of the three investors that omitted the existence of the Side Accounts or the trading activity outside the Fund's mandate. Through written or oral communications, Bressler made misleading representations to all three of these investors. These three investors would not have invested in the Fund if they had known Bressler, as Fund Portfolio Manager, was not following the Fund's conservative investment mandate, as represented.

33. Up until the very end, Bressler continued to solicit prospective Fund investors, parroting the Fund's conservative investment strategy and touting the Fund's allegedly strong performance. For example, on February 6, 2018, Bressler emailed a potential investor that, despite massive market volatility and losses, "Carbon emerged unscathed" and is "to be named the #2 performing market neutral fund of 2017." Also on February 6, 2018, after the Fund had suffered considerable losses, Bressler assured one Fund Investor via email that the Fund was doing well. Specifically, the investor emailed Bressler asking: "How are we holding up? Crazy trading yesterday!" Bressler immediately responded that "We made money Friday, Monday, and today – not sure it's indicative of anything but dumb luck, but I'll take it." On February 9, 2018, just two days after an unauthorized trade that resulted in losses of around $6.5 million, Bressler emailed another prospective investor falsely claiming that "yesterday was fine, thank goodness, but lots of carnage out there." That same day, however, Bressler spoke with Fund counsel, admitting "the Fund has no assets."

**Bressler's Fraudulent Intent**

34. During his risky and unauthorized trading, and after the Fund's implosion,

Bressler's contemporaneous communications revealed his fraudulent intent. On February 7, 2018, the day of his fatal trade in a non-industrial stock, Bressler messaged with two friends:

> Friend 1: are you really long [the non-industrial stock]?
> BRESSLER: yes
> Friend 1: 45mm of [non-industrial stock]?
> BRESSLER: I told you, this is a career bet
> Friend 2: Is this like trying to be funny
> BRESSLER: no
> BRESSLER: I had a horrible day
> Friend 1: thats like criminal
> BRESSLER: Not much to lose
> Friend 1: if it blows up
> Friend 1: you get sued
> BRESSLER: I'm fcked either way
> Friend 2: U had a bad day
> Friend 2: So just betting it all
> Friend 2: On [non-industrial stock]
> BRESSLER: yes
> BRESSLER: I hope it's up 10%
> BRESSLER: Otherwise I am fcked
> Friend 1: there is -0- percent chance
> Friend 1: that your partner
> Friend 1: or [prime broker]
> Friend 1: would ever permit this
> BRESSLER: Prob not
> BRESSLER: But too late now

35. After the Fund's implosion, Bressler exchanged a series of lengthy texts with a Fund Investor. In text messages to the investor on February 10 and February 11, 2018, Bressler stated, among other things, that he "f*cked up;" was "scared," "ruined everything," and "made a big mistake;" the Fund didn't "have any money to cover it;" the loss was "catastrophic;" his "career is over;" and "[m]y life is over."

**Bressler Intentionally Misled Fund Investors**

36. Bressler, as Portfolio Manager for the Fund and Chief Investment Officer for Carbon, made misleading statements and omissions from at least September 2017 until the Fund's collapse in February 2018. During this period of time, and unbeknownst to Fund

Investors, Bressler placed trades, many of which he allocated to the Side Accounts, that were outside the Fund's conservative investment mandate and contrary to representations that he made—and was making—to Fund Investors and prospective investors.

37. Additionally, from September 2017 to February 2018, Bressler solicited at least three additional Fund investors. Bressler failed to tell these investors that he was placing Fund trades, including in options, that fell outside of the Fund's strategy and that the Side Account positions were margined against the Primary Account holdings. Rather, Bressler sent them tear sheets (that he drafted) touting the key aspects of the Fund's conservative strategy, including that it was to be a market-neutral hedge fund focused on equities in the industrial sector with emphasis on capital preservation and a net exposure of close to zero percent. These misleading omissions and statements were material. None of these additional investors would have invested in the Fund had they known that the conservative investment strategy, as represented, was not going to be followed and that, instead, their money was to be used to make risky and unauthorized trades.

38. Bressler made these false representations and omissions with scienter. He knew that he was placing Fund trades that were outside the Fund's conservative investment strategy. He personally placed the high-risk trades that wiped out all of the Fund's assets. Further, in "real time" during a catastrophic trade representing over 3,000% of the Fund's value, Bressler cavalierly exchanged messages with friends. He stated that he had made this "career bet" trade -- which one friend said was "criminal" and could get him sued -- because he had had "a horrible day."

**FIRST CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

39. The Commission re-alleges and incorporates paragraphs 1 - 38 by reference as if fully set forth herein.

40. By engaging in the acts and conduct alleged herein, Bressler, directly or indirectly, singly or in concert with others, acting intentionally, knowingly, or recklessly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

    a.    employed a device, scheme, or artifice to defraud;

    b.    made untrue statements of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or,

    c.    engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon certain persons.

41. By reason of the foregoing, Bressler has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

42. The Commission re-alleges and incorporates paragraphs 1 - 38 by reference as if fully set forth herein.

43. By engaging in the acts and conduct alleged herein, Bressler, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

    a.    intentionally, knowingly, or recklessly employed a device, scheme, or artifice to defraud;

    b.  intentionally, knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.  intentionally, knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchasers of the securities.

44. By reason of the foregoing, Bressler has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. §§ 80b-6(1)-(2)]

45. The Commission re-alleges and incorporates paragraphs 1 - 38 by reference as if fully set forth herein.

46. Bressler was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Bressler was Portfolio Manager of the Fund and received a salary in that role. He was also one-third owner and Chief Investment Officer of Carbon. Bressler had primary authority for trading in the Fund and Carbon told Fund Investors that he was responsible for making their investment decisions.

47. By engaging in the acts and conduct alleged herein, while acting as an investment adviser, Bressler, directly or indirectly, by use of the mails or the means or instrumentality of interstate commerce:

        a.      knowingly, willfully, or recklessly employed a device, scheme, or artifice to defraud; and/or,

        b.      knowingly, willfully, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as fraud or deceit upon a client or prospective client.

48.    By reason of the foregoing, Bressler has violated, and unless enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

### FOURTH CLAIM FOR RELIEF
### Violation of Sections 206(4) and Rule 206(4)-8 of the Advisers Act
### [15 U.S.C. § 80b-6(4); 17 CFR § 275.206(4)-8]

49.    The Commission re-alleges and incorporates paragraphs 1 - 38 by reference as if fully set forth herein.

50.    The Fund was a pooled investment vehicle within the meaning of Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] of the Advisers Act.

51.    By engaging in the acts and conduct alleged herein, Bressler, while acting as an investment adviser to a pooled investment vehicle, directly or indirectly, acting with intent, recklessness, or at least negligence (a) made untrue statements of a material fact and/or omitted to state a material fact necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and/or prospective investors in the Fund, and/or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

52. By reason of the foregoing, Bressler has violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 promulgated thereunder [17 C.F.R. § 275.206(4)-8].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Bressler violated the provisions of the federal securities laws alleged herein;

**II.**

Permanently restraining and enjoining Bressler from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Section 17(a) of the Securities Act [15 U.S.C. § 77(q)(a)]; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**III.**

Ordering Bressler to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**IV.**

Permanently barring Bressler from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that

is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

**V.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: August 30, 2022                  Respectfully submitted,

                                                /s/ David B. Reece
                                                David B. Reece*
                                                Texas Bar No. 24002810

                                                *Application for admission *pro hac vice* pending

                                                U.S. Securities and Exchange Commission
                                                801 Cherry Street, Suite 1900
                                                Fort Worth, Texas 76102
                                                Tel: (817) 978-6476
                                                reeced@sec.gov